# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
        v.                      )        Criminal Action
                                )        No. 17-10249-PBS
DOUGLAS NORRIS,                 )
                                )
                Defendant.      )
_____)


## MEMORANDUM AND ORDER

June 8, 2018

Saris, C.J.

## INTRODUCTION

Defendant Douglas Norris, charged with drug and gun crimes, moves to suppress the fruits of a warrant-authorized search of his Brockton apartment. His motion attacks the search on three primary grounds. First, he argues the search warrant affidavit failed to provide probable cause to believe contraband would be found in the apartment. Second, he contends the search exceeded the scope of the warrant. Third, he argues the affidavit omitted information and included misinformation material to the probable cause determination, and thus he seeks a hearing under Franks v. Delaware, 438 U.S. 154 (1978). For the reasons that follow, the motion (Dkt. No. 53) is **DENIED** in all respects.

**FACTUAL BACKGROUND**

The search warrant affidavit at issue in this case was signed by Brockton Police Detective Gary Mercurio, Jr. See generally Dkt. No. 54-1 ("Aff."). At the time he signed the affidavit, Mercurio had been a police officer for 17 years and was a member of the Brockton Police Department's narcotics/vice unit. Aff. 1. In the course of that work, Mercurio attended numerous trainings related to narcotics investigations, and he amassed an array of pertinent investigative experience, including working with informants. Aff. 1-2.

## I.    Confidential Informant

In June 2017, Det. Mercurio and Det. Graham spoke with a confidential informant ("CI"). Aff. 3. On June 13, the CI told the detectives that someone by the name of "LD" or "Dougie" was distributing cocaine base and powder from a multifamily dwelling at 145 North Warren Avenue, Apt. 2A, in Brockton ("Apt. 2A"). Aff. 3. The CI identified the building to Det. Graham and stated that a number of aggressive pit bulls lived inside. Aff. 3. The CI also provided the phone number of a male resident who sold drugs from the building. Aff. 3. The phone number was assigned to a prepaid cell phone. Aff. 3.

The detectives were already familiar with the residence and believed that a narcotics dealer named Douglas Norris lived there. Aff. 3. In February 2017, the detectives received

information from a "confidential source" (apparently different from the CI) that a male named "Dougie" was dealing cocaine base from Apt. 2A. Aff. 3. Also, Det. Graham had purchased cocaine base from Norris in 2014, albeit at a different location. See Aff. 3.

In response to the CI's tip, Det. Graham searched Brockton Police records and located a January 2017 police report regarding a domestic disturbance call from 145 North Warren Avenue, Apt. 2A. Aff. 3. The report identified Douglas Norris as a resident of Apt. 2A. Aff. 3. The report also mentioned loose pit bulls inside the residence. Aff. 3. Additionally, Det. Graham found a November 2016 record indicating that a Nakaitia Brown called Brockton Police for a welfare check on Douglas Norris at Apt. 2A. Aff. 3-4.

Det. Graham then showed the CI a color booking photo of Norris with "long braids." Aff. 4. The CI positively identified Norris as the individual from whom the CI had purchased cocaine. Aff. 4. The CI stated that although Norris had since cut his hair, the CI was "certain" it was the same person. Aff. 4.

The CI told the detectives that he had purchased cocaine numerous times from this individual. Aff. 4. Typically, the CI would order drugs by calling the phone number mentioned above and would then be directed to arrive at Apt. 2A within a specified time frame. Aff. 4. After knocking on an outside door,

the man known as "LD" or "Dougie" would bring the CI up to a second-floor apartment, the door to which was marked with "2A." Aff. 4. Inside, "Dougie" would sell the CI cocaine. Aff. 4. The CI described the seller as "a black male, in his late 30's [sic], medium build, with black hair." Aff. 4.

## II.  Controlled Buys

The CI agreed to make controlled drug buys from Apt. 2A. Aff. 4-5. On June 13, 2017, the detectives met the CI at a prearranged location and checked to make sure the CI was not carrying any drugs or money. Aff. 5. The detectives then gave the CI a sum of money to execute a controlled buy. Aff. 5. The CI called the number described above and placed an order for cocaine base. Aff. 5. The CI traveled to Apt. 2A under the observation of Det. Graham, Det. Mercurico, and a third detective. Aff. 5. They watched the CI knock on the door, which was opened by a "black male." Aff. 5. After about three minutes inside, the detectives saw the CI exit by the same door. Aff. 5.

The CI returned to the prearranged location, still under observation by the three detectives. Aff. 5. The CI told the detectives that "Dougie" had let him inside and led him up to Apt. 2A. Aff. 5. Once inside, the CI exchanged money for what was believed to be cocaine base before leaving the residence. Aff. 5. The CI handed Det. Graham an unspecified amount of what later field-tested positive for cocaine. Aff. 5-6.

Two days later, on June 15, 2017, Det. Mercurio was conducting surveillance on 145 North Warren Avenue. Aff. 6. Around 4 p.m., he saw Norris exit the residence and recognized him from a police photograph. Aff. 6. Norris then entered a gray 2003 Infiniti G35, with Massachusetts license plate number 5YH163, that was parked nearby. Aff. 6. Norris started the car and remained inside for a "short time." Aff. 6. He then exited and went back inside 145 North Warren Avenue. Aff. 6.

The CI made another controlled buy the following day, June 16, 2017. Aff. 6. After repeating the steps described above, the CI knocked on the door to 145 North Warren Avenue and was let inside. Aff. 6. After remaining inside for about two minutes, the CI returned to the prearranged location. Aff. 6-7. The CI provided the detectives with another unspecified quantity of a substance that later field-tested positive for cocaine. Aff. 7.

## III. **Scope of the Warrant**

The search warrant affidavit sought permission to search Apt. 2A for "[a]ll controlled substances," materials related to the production or distribution of controlled substances, and any records (electronic or otherwise) related to such an enterprise. Aff. 8. The affidavit also requested permission to enter Apt. 2A without officers first knocking and announcing their presence. Aff. 7. Det. Mercurio cited three reasons: (1) the presence of "several aggressive pit bulls" inside the residence; (2)

5

Norris's criminal history, which included convictions for
narcotics offenses, firearm and ammunition offenses, armed
robbery, resisting arrest, assault and battery with a dangerous
weapon, and assault and battery; and (3) the potential
destruction of evidence. Aff. 7.

## IV.  **Execution of the Warrant**

According to a police report by Det. Mercurio, a team of
officers executed the search warrant at 5 a.m. on June 20, 2017.
Dkt. No. 54-2 ("Rpt."). Officers broke open the outside door to
145 North Warren Avenue using a battering ram and did the same
to the door of Apt. 2A. Rpt. 1. Inside, they found four
individuals: Norris's girlfriend, Nakaita Brown; their son,
Douglas Norris, Jr.; Jose Lora; and Adris Pimental. Rpt. 1.
Norris was not there. Rpt. 1.

Inside the closet of what was believed to be Norris's
bedroom, officers located a backpack that contained a Smith &
Wesson 9mm pistol loaded with a large-capacity magazine, a
plastic bag containing 20 rounds of 9mm ammunition, one round of
45-caliber ammunition, a plastic bag containing 48.2 grams of
suspected cocaine base, a plastic bag containing 31.8 grams of
suspected cocaine powder, a plastic bag containing 2.5 grams of
suspected cocaine powder, and two digital scales. Rpt. 2. Inside
the room, officers also found a kilo press, two other digital
scales that had white residue on them, cut baggies, a razor

blade, and a box of sandwich bags. Rpt. 2. And they found mail
addressed to Norris at the target address. Rpt. 2.

In the kitchen, officers located scale-calibration weights,
one bag plastic bag containing 12.2 grams of suspected cocaine
base, and another plastic bag containing 18.7 grams of suspected
cocaine powder. Rpt. 1-2. In a back bedroom, officers located
kilo press equipment, an electric money counter, a rifle scope,
and a Smith & Wesson magazine. Rpt. 1. In another bedroom, they
found $147 and two digital scales. Rpt. 1.

Field tests on each bag of suspected cocaine yielded
positive results. Rpt. 2. All of the above items were
photographed and placed into the Brockton Police evidence
locker. Rpt. 2.

## V.    **Arrest of Defendant**

At around 7:50 a.m. that same morning, Det. Brian Donohue
observed Norris leave 145 North Warren Avenue and get into the
aforementioned gray Infiniti G35. Rpt. 2. Norris drove off. Rpt.
2. After following the vehicle for a short time, police stopped
it and placed Norris under arrest. Rpt. 2.

## VI.  **Charges**

Norris was charged in this Court by criminal complaint in
July 2017, Dkt. No. 1, followed by an initial indictment in
August 2017, Dkt. No. 11. In October 2017, a superseding
indictment charged Norris with four counts: (1) being a felon in

possession of a firearm, 18 U.S.C. § 922(g)(1); (2) possession of cocaine base with intent to distribute, 21 U.S.C. § 841(a)(1); (3) possession of cocaine powder with intent to distribute, 21 U.S.C. § 841(a)(1); and (4) possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A). Dkt. No. 28.

## DISCUSSION

Defendant takes a shotgun approach to his attack on the search of Apt. 2A. Primarily, he argues there was no probable cause to believe contraband would be present in the apartment because police relied on dubious information from a confidential source and defective controlled buys. He also argues the affidavit failed to demonstrate a sufficient nexus between Apt. 2A and suspected criminal activity, and failed to describe the property to be searched with sufficient particularity. And he argues the seizure of the gun resulted from the search exceeding the scope authorized in the warrant. In addition, Defendant seeks a <u>Franks</u> hearing on the theory that the affidavit included several material omissions or misstatements. These arguments fail.[1]

---

[1]    In addition to opposing these arguments, the Government attacked the Defendant's standing to raise them. The Government suggested Defendant did not carry his burden to demonstrate a privacy interest in the apartment or the items seized. But on the day of the hearing, Defendant filed an affidavit averring that he was a tenant in Apt. 2A. To the extent there was any lingering question about standing, this affidavit put it to bed.

I.  **Probable Cause for the Search**

A.  Legal Standard

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013) (quoting U.S. Const. amend. IV). "With limited exceptions, it requires police officers to secure a search warrant supported by probable cause prior to effecting a search or seizure." Id. "Probable cause exists when the totality of the circumstances suggests that there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (citation and quotation marks omitted).

Where, as here, the probable cause determination flows from information provided by a confidential informant, "the affidavit must provide some information from which a magistrate can credit the informant's credibility." Id. at 99. In such a circumstance, the First Circuit employs a nonexhaustive list of factors to examine the affidavit, including: (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable or practicable (e.g., through

police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information. Id.

B.   Analysis

Defendant argues the "main problem" with the affidavit is that it lacks any corroborating information to demonstrate the reliability of the CI. In his view, because the magistrate had no way to gauge the CI's reliability, the probable cause determination was defective.

This argument gives short shrift to the CI's two controlled buys. See Aff. 4-7. The First Circuit has recognized that controlled buys, while not per se sufficient to establish probable cause, can bolster an informant's reliability and thereby support a finding of probable cause. See United States v. Khounsavanh, 113 F.3d 279, 285–86 (1st Cir. 1997) (concluding that controlled buy, in totality of circumstances, provided substantial basis for finding of probable cause); United States v. Garcia, 983 F.2d 1160, 1167 (1st Cir. 1993) (approving "reasonable inference of probable cause" based, in part, on controlled buy). Typically, "a properly conducted controlled buy is formidable evidence to support a search." United States v. Genao, 281 F.3d 305, 308 (1st Cir. 2002).

Here, the affidavit detailed two controlled buys in which the CI purchased cocaine from Norris in Apt. 2A. Aff. 4-7. Defendant attempts to undercut the corroborative value of these controlled buys by suggesting that, because police did not observe the CI actually enter Apt. 2A and purchase the cocaine from Norris, it is possible that the CI framed Norris by stashing the drugs somewhere else inside 145 North Warren Avenue. This is a farfetched argument that the First Circuit rejected in Garcia as "possible" but not "probable." 983 F.2d at 1167. Because the possibility of the CI setting up Defendant "strains credulity on a common-sense reading" of the affidavit, id., the Court is not persuaded that it undermines the magistrate's finding of probable cause.

The Court is similarly unmoved by any "minor discrepancies" regarding the nature of the cocaine (powder versus base) purchased from Norris. See Khounsavanh, 113 F.3d at 287 (noting that magistrate may "disregard petty inconsistencies" in an informant's statements). Although critical for sentencing purposes, the difference between cocaine powder and base is immaterial to the probable cause analysis in this case. Either is contraband.

Defendant's argument also ignores or downplays other indicia of the CI's reliability. For instance, when the CI identified 145 North Warren Avenue as the location of prior

11

cocaine purchases, the officers already (four months earlier) had received a tip that someone named "Dougie" was dealing drugs from this residence. See Aff. 3. The CI also positively identified Norris in a booking photo, noting that Norris had since cut his hair. Aff. 4. Furthermore, as discussed in more detail below, Det. Graham had purchased cocaine from Norris at an undisclosed location in 2014. Aff. 3. While these details did not "wholly eliminate[]" the risk that the CI was lying or mistaken, they did, in combination with the controlled buys, substantially reduce those possibilities. See Khounsavanh, 113 F.3d at 284.

Defendant also is correct that the affidavit did not describe any prior interactions between the CI and police, nor did it include an assertion of the CI's reliability. However, the absence of such information does not vitiate probable cause. See id. at 287. The "probable cause determination is fundamentally a fact-specific inquiry" in which "[n]o one factor possesses talismanic powers." Id. at 285. Here, a common-sense reading of the affidavit would readily lead a magistrate to conclude that there was a "fair probability" of contraband being located in Apt. 2A. See id. at 283; Garcia, 983 F.2d at 1167.

For essentially the same reasons, Defendant's argument that the affidavit failed to demonstrate a sufficient nexus between criminal activity and Apt. 2A is unavailing. Police observed the

CI make controlled buys from the target location. Such evidence can readily support the nexus element. See, e.g., United States v. Dixon, 787 F.3d 55, 60 (1st Cir. 2015) (finding "ample probable cause to believe" defendant kept drug-related materials at apartment based on observations of him leaving from and returning to apartment before and after controlled buys). Here, in between the two controlled buys, police witnessed Norris exit from and return to the 145 North Warren Avenue building. Defendant's insistence that the police needed to provide additional corroboration that the CI actually obtained the cocaine from inside Apt. 2A, and not somewhere else inside the building, is unreasonable in light of the other information they had linking Norris to the target apartment.

Accordingly, Defendant's four-corners attack on the affidavit fails.

## II.  Scope of the Search

### A.  Legal Standard

Under the Fourth Amendment, "[t]he authority to search conferred by a warrant is circumscribed by the particular places delineated in the warrant and does not extend to other or different places." United States v. Fagan, 577 F.3d 10, 13 (1st Cir. 2009). But where, as here, a defendant argues that a search exceeded the scope of a warrant, the plain view doctrine may come into play. This doctrine permits a law enforcement agent,

without a warrant, to "seize an object in plain view so long as he or she has (1) lawfully reached the vantage point from which he sees the object, (2) has a right of access to the object itself, and (3) has probable cause to support his seizure of that object." United States v. Crooker, 688 F.3d 1, 8 (1st Cir. 2012).

B.   Analysis

At the hearing, Defendant stipulated to the fact that officers found the Smith & Wesson pistol inside a backpack, inside a closet, in a bedroom they believed belonged to Norris. However, in his brief, Defendant contends that the officers lacked authority to search the backpack itself. This argument plainly fails. The warrant authorized police to search Apt. 2A for controlled substances, which could readily be stored inside a backpack. See Crooker, 688 F.3d at 8 (noting that "any container situated within residential premises which are the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant").

Defendant next argues that police had no indication that the gun was itself evidence of a crime or contraband. To the contrary, the officers were aware that Norris's criminal history -- detailed in the affidavit -- would prevent him from lawfully possessing a firearm. Thus, at the time they encountered the gun

inside the backpack, the officers reasonably believed that he unlawfully possessed it. See United States v. Mousli, 511 F.3d 7, 13–14 (1st Cir. 2007) (approving seizure of firearms where, "[b]ased on [defendant's] record, the police reasonably believed he was not licensed to have the firearms that were in his apartment"). Alternatively, the First Circuit has recognized "that firearms are one of the tools of the trade of drug dealers." United States v. Caggiano, 899 F.2d 99, 103–04 (1st Cir. 1990), abrogated on other grounds by Horton v. California, 496 U.S. 128 (1990). Thus, "[a]ny reasonably competent police officer who discovered firearms while searching for drugs would be immediately aware of their evidentiary significance." Id. at 104. This principle carries particular weight here, where the gun was located in the same container as a substantial amount of suspected cocaine.

Therefore, the search of Apt. 2A did not exceed the scope of the warrant.

III. **Franks Hearing**

A.    Legal Standard

Because an affidavit supporting a search warrant is entitled to "a presumption of validity," a defendant must meet a "high bar" to get a Franks hearing. United States v. Tzannos, 460 F.3d 128, 136 (1st Cir. 2006) (quoting Franks, 438 U.S. at 171). To do so, "the defendant must make two 'substantial

preliminary showing[s].'" <u>United States v. Patterson</u>, 877 F.3d 419, 424 (1st Cir. 2017) (quoting <u>Franks</u>, 438 U.S. at 155) (alteration in original).

First, the defendant must show that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." <u>Id.</u> "With respect to this initial showing, '[m]ere inaccuracies, even negligent ones, are not enough to warrant a <u>Franks</u> hearing.'" <u>Id.</u> (quoting <u>United States v. Santana</u>, 342 F.3d 60, 66 (1st Cir. 2003)).

Second, the defendant must "make a substantial showing that the 'allegedly false statement is necessary to the finding of probable cause.'" <u>Id.</u> (quoting <u>Franks</u>, 438 U.S. at 156). If removing the false material would vitiate probable cause, the warrant "must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." <u>Id.</u>

The same framework applies when a <u>Franks</u> challenge is based upon material <u>omitted</u> from an affidavit. <u>United States v. Tanguay</u>, 787 F.3d 44, 49 (1st Cir. 2015). Again, "[t]he required showing is two-fold: first, the omission must have been either intentional or reckless; and second, the omitted information, if incorporated into the affidavit, must be sufficient to vitiate probable cause." <u>Id.</u> "Because there is no requirement that every

shred of known information be included in a warrant affidavit, the omission of a particular detail, without more, is not enough to satisfy the mens rea element of the Franks test." Id. "Recklessness may be inferred directly from the fact of omission only if 'the omitted information was critical to the probable cause determination.'" Id. (quoting Burke v. Town of Walpole, 405 F.3d 66, 81 (1st Cir. 2005)) (emphasis in original). Negligent omissions -- even of highly probative information -- "do not satisfy this strict standard." Id.

B.  Analysis

1.  *Drug Deal in 2014*

Defendant's main argument on Franks is that the affidavit misstated the facts surrounding Det. Graham's purchase of cocaine from Norris in 2014. Specifically, Defendant states that the police report of this incident actually describes Norris "exchanging something" with a third party, Jesse Bettancourt, who then approached Det. Graham and handed him crack. He also points out that the affidavit fails to mention that this transaction occurred at a Brockton hotel. According to Defendant, this omission would lead the magistrate to assume the transaction occurred at 145 North Warren Avenue.

The omitted detail about the intermediary was not material. Whether Norris handed the cocaine directly to Det. Graham or delivered it to him through an intermediary would make little,

if any difference, to the issuing magistrate. The focus of the probable-cause analysis in this case is whether there was "fair probability" that evidence of drug-dealing would be found in Apt. 2A. See Gifford, 727 F.3d at 98. Norris's involvement as a source in a prior drug deal -- with or without an intermediary -- would tend to increase the probability that evidence of drug-dealing existed in his apartment. Moreover, although it could have been written more clearly, the affidavit never states that the earlier drug deal occurred at the target apartment. Rewriting the affidavit to include the actual location of the 2014 drug deal would not undermine probable cause.

### 2. Norris's Most Recent Conviction

Defendant argues that Det. Mercurio neglected to disclose that Norris's most recent conviction was from 2005 and was not drug-related. Rather, Norris's most recent drug conviction was for marijuana possession in 2002. Even if the affidavit were rewritten to state the latter, it would not have changed the magistrate's analysis. In this context, the difference between a 12-year-old drug conviction and a 15-year-old drug conviction is negligible. Neither would carry much, if any, weight with the issuing magistrate.

### 3. CI's Description of Norris

Defendant argues that the CI gave police a "generic" description of a black man. He points out that the CI stated

Norris was of "medium" build and did not mention facial hair, while the booking sheet from after this arrest describes Norris as heavy with a mustache and beard. Defendant does not explain how this information can be construed as a misstatement or omission by Det. Mercurio. Nor does he explain how it would be material to the magistrate's probable cause determination. In any event, whatever shortcomings may have existed in the CI's description of Norris, or with the identification based on the old booking photo for that matter, the controlled buys and other corroborative information in the affidavit render these details immaterial to the probable cause determination.

       *4.   Indicia that Norris Lived in Apt. 2A*

Here, Defendant rehashes his nexus arguments discussed above. He does not identify any specific misstatements in the affidavit, although he seems to take issue with Det. Mercurio's description of the prior police records tying Norris to Apt. 2A. As above, the CI's controlled buys demonstrated sufficient nexus between Apt. 2A and drug dealing to support the magistrate's probable cause finding.

       *5.   Unreliability of CI and Det. Mercurio*

Although not advanced in his brief, Defendant at the hearing launched a new attack on the reliability of both the CI and Det. Mercurio. With respect to the CI, Defendant pointed out that the affidavit says nothing about the CI's track record or

personal motivation for helping police (e.g., whether the CI was seeking leniency in another case or acting out of pure altruism). According to Defendant, this lack of information is compounded by indicia that Det. Mercurio is an unreliable reporter of facts. For example, upon discovering that Norris was not present when they executed the search warrant, police apparently did not ask any of the other occupants about the contraband they found. Similarly, the affidavit mentions the presence of Norris's vehicle at 145 North Warren Avenue on June 15, 2017 -- the day in between the two controlled buys -- but says nothing about whether the vehicle was present at the time of the two controlled buys.

There is little doubt that a CI's track record of unreliability, if known to police, ought to be disclosed in a search warrant affidavit. For example, in United States v. Vigeant, the First Circuit explained that the "omission of known unreliability," such as a "CI's long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability," would deprive the magistrate of an opportunity to assess the totality of the circumstances. 176 F.3d 565, 573 & n.9 (1st Cir. 1999). Therefore, such information should be disclosed despite "some degree of corroboration" of the CI's statements. Id. n.9.

However, regardless of the criticism of the officers' failure to ask certain questions at the search, Defendant offers nothing to support his intimation that the CI here had any such record of unreliability, or that such a hypothetical record was known to police. On the whole, Defendant appears to be suggesting that this case should trigger the "duty of further inquiry" discussed in Tanguay. 787 F.3d at 53 (discussing how officer's "knowledge of an obvious and unexplored reason to doubt the truthfulness of [an informant's] allegations" constitutes a "red flag" triggering officer's duty of further inquiry). But unlike the situation in Tanguay, Defendant here offers no concrete reason why police should have doubted the CI's honesty. See United States v. Koudanis, 207 F. Supp. 3d 115, 128–29 (D. Mass. 2016) (distinguishing Tanguay and noting that "mere possibility of discovering damning information" is not enough to trigger duty of further inquiry). Therefore, Defendants' unbriefed arguments also fail to make either of the substantial preliminary showings required for a Franks hearing.

### 6. Summary

Defendant has not made a substantial preliminary showing that any of the alleged misstatements or omissions were made knowingly, intentionally, or with reckless disregard for the truth. Further, he has not shown that they would have been

material to the probable cause analysis. Accordingly,
Defendant's motion for a <u>Franks</u> hearing is denied.

## IV. **Other Arguments**

Defendant makes several additional arguments, none of which
is availing. He argues that the affidavit did not describe the
premises to be searched with sufficient particularity because it
alternately described the target as "2A" and "2," and because it
did not describe other aspects of the apartment building.
However, the actual search warrant identifies the target as
"Apt. 2A," extinguishing any ambiguity that may have arisen in
the affidavit. The Court is satisfied that this description was
"sufficient to enable the executing officer to locate and
identify the premises with reasonable effort," and Defendant has
not identified "any reasonable probability that another premise
might be mistakenly searched." <u>See</u> <u>Mousli</u>, 511 F.3d at 12.

Defendant also argues that the good-faith exception to the
warrant requirement does not apply. And he argues the illegality
of the original search of Apt. 2A taints the subsequent search
of the seized firearm. Because the Court concluded above that
the search of Apt. 2A was lawful, it need not reach these two
alternative arguments.

**ORDER**

For the reasons given, Defendant's motion to suppress and
for a <u>Franks</u> hearing (Dkt. No. 53) is **DENIED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge